**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RED MORTGAGE CAPITAL, LLC,**

        **Plaintiff,**

    **v.**                                                    **Case No.: 2:16-cv-678**
                                                            **JUDGE SMITH**
                                                            **Magistrate Judge Kemp**

**SHORES, LLC,** *et al*.,

        **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court upon the Motion to Dismiss of Defendants Shores, LLC ("Shores") and Jerry B. Epstein ("Epstein").  Defendants have moved this Court to dismiss Plaintiff's Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and for improper venue pursuant to Fed. R. Civ. P. 12(b)(3) (Doc. 16).  In the alternative, Defendants moved to transfer the present action to the U.S. District Court for the Central District of California pursuant to 28 U.S.C. § 1391, 28 U.S.C. § 1406, and 28 U.S.C. § 1404(a).  Plaintiff RED Mortgage Capital, LLC ("RED") responded in opposition (Doc. 25) and Defendants replied in support (Doc. 28).  The Motions are fully briefed and ripe for review.  For the following reasons, Defendants' Motions are **DENIED**.

## I.    FACTUAL BACKGROUND

This case arises out of a $125 million loan (the "Loan") from RED to Shores for the purposes of constructing a twelve-building, 544-unit multi-family housing unit in Marina del Rey, California (the "Project").  (Doc. 1, Compl. at ¶ 51).  RED, a commercial mortgage lender, is a limited liability company organized and existing under the laws of the State of Delaware.

(*Id.* at ¶ 5).  Through a chain of membership and holding companies, RED is also a citizen of Texas for the purposes of diversity citizenship.  (*Id.* at ¶¶ 6–22).  RED is headquartered in Columbus, Ohio and a large majority of RED's employees are located in the company's Columbus office.  (Doc. 25-1, Smith Decl. at ¶ 3).  Shores is a limited liability company organized and existing under the laws of the State of Delaware.  (Doc. 1, Compl. at ¶ 23).  Through a chain of membership, Shores is a citizen of California and New York for the purposes of diversity jurisdiction.  (*Id.* at ¶¶ 24–47).  Epstein is a citizen of the State of California.  (*Id.* at 34).  Epstein is the President of Del Rey Shores, LLC, Shores' Managing Member.  (Doc. 25-1, Smith Decl. at ¶ 6).  Epstein owns 50% of Shores through various companies and family trusts.  (*Id.*).  Epstein also owns a management company which handles the day-to-day operations of the Subject Property.  (*Id.* at ¶ 7).

In March 2010, Shores submitted an application to RED for a Federal Housing Authority ("FHA")-insured construction loan to construct the Project.  (*Id.* at ¶ 8).  In general, the type of loan sought by Shores requires a lender to examine the feasibility of the project, determine the creditworthiness of the borrower and its principals, and navigate the application process with the Department of Housing and Urban Development ("HUD") to ensure government approval of the loan.  (*Id.* at 10).  The Loan's underwriting process lasted approximately ten months and required extensive contact between Shores and RED representatives, many of which were located in Columbus.  (*Id.* at ¶¶ 11–12).  Contacts with RED representatives in Columbus included, in part, hundreds of phone calls, emails, paper mail correspondences, and Shores delivered several checks to RED in Columbus to cover costs associated with the underwriting process.  (*Id.* at ¶ 12).  The chief actors for Shores during this time were Epstein; David Levine, VP of Del Rey Shores and Epstein's chief of staff; Patricia Flynn, a loan-process consultant and advisor working

for Shores; and Larry Levy, Epstein's legal counsel.  (*Id.* at ¶¶ 5, 6, 11, 14).  Shores and its representatives did not deal with RED's representatives exclusively in Ohio.  RED has additional representatives located in Los Angeles, San Diego, and Washington, D.C. that were also involved in the loan process.  (Doc. 16-1, Levine Decl. at ¶ 12).  In addition, Shores submitted its pre-loan and final loan applications to HUD representatives in Los Angeles.  (*Id.* at ¶ 11).  No Shores employee or representative ever traveled to Ohio to "apply for, negotiate, accept, guarantee, close, or perform the Loan."  (*Id.* at ¶ 15).

RED submitted its final loan application to HUD on January 20, 2011, and the parties set about preparing the closing documents.  (Doc. 25-1, Smith Decl. at ¶ 14).  The Loan closed on March 3, 2011, at the offices of Munger Tolles & Olson, LLP and at HUD's hub office, both located in Los Angeles.  (Doc. 16-1, Levine Decl. at ¶ 16).  The following documents, among others, were contemplated and/or executed by the parties on or around the Loan's closing date:

(1) Lender's Commitment Letter dated March, 2, 2011 (the "Commitment Letter");

(2) Rate Lock Letter;

(3) Deed of Trust Note dated as of March 1, 2011 (the "Note");

(4) Deed of Trust with Assignment of Rents dated March 1, 2011 (the "Deed of Trust");

(5) Building Loan Agreement dated as of March 1, 2011;

(6) Construction Loan Disbursement Agreement dated March 3, 2011;

(7) Confirmation Letter dated March 2, 2011;

(8) Opinion Letter from Shores' counsel dated March 3, 2011 (the "Opinion Letter"); and

(9) Epstein Guaranty Agreement dated as of March 2, 2011 (the "Guaranty")

(*Id.* at ¶ 53–54).

Of particular importance here are the Commitment Letter, the Opinion Letter, and the Guaranty.  The Commitment Letter contained a forum selection clause designating "the federal or local courts of Ohio" as the exclusive forum for any disputes arising thereunder.  (*See* Doc. 1-2, Commitment Letter at 11).  The Commitment Letter also stated that Shores was required to pay to RED any extension or other fees as set forth in the Confirmation Letter.  In turn, the Confirmation Letter specified that Shores was required to pay to RED a recurring monthly extension fee if Shores was unable to achieve Final Endorsement of the Loan by November 1, 2013.  (Doc. 1-8, Confirmation Letter at 3).  The Commitment Letter also required Epstein to execute the Guaranty—which was attached to and incorporated into the Commitment Letter— thereby making Epstein jointly and severally liable for the extension fee obligation.  Epstein signed the Guaranty, but the parties dispute whether Shores or one of its representatives ever signed the Commitment Letter—the only document which contained an Ohio forum selection clause.  On March 3, 2011, at the request of Shores, Levy issued the Opinion Letter.  (*See* Doc. 1-9, Op. Letter).  In the Opinion Letter, Levy represented that he reviewed a number of documents, including the Commitment Letter (defined in the Opinion Letter as one of the "Loan Documents"), and that "each of the Loan Documents has been duly executed and delivered by the Mortgagor and constitute the valid and legally binding promises or obligations of the Mortgagor, enforceable against the Mortgagor in accordance with its terms."  (*Id.* at 8–9).  Further, in 2015, Levy sent an email to RED's counsel stating that he did recall Shores signing and delivering the Commitment Letter at the Loan's closing.  (*See* Doc. 1-11, Levy Email).

Construction of the Project commenced shortly after the Loan closed, and RED regularly disbursed funds on an "as-needed" basis pursuant to the terms of the Loan.  (Doc. 25-2, Murnane Decl. at ¶ 6).  For reasons that are not relevant at this stage of the litigation, Shores completed

construction of the Project in the fall of 2013 but was not able to achieve Final Endorsement of the Loan by November 1, 2013.  (Doc. 1, Compl. at ¶ 80).  RED alleges that this failure entitles it to collect Extension Fees from Shores and Epstein.  (*Id.* at ¶ 81).  In February 2014, RED began invoicing Shores for said Extension Fees.  (Doc. 16-1, Levine Decl. at ¶ 27; Doc. 25-1, Smith Decl. at ¶ 17).  RED's Complaint alleges that over $5.3 million in Extension Fees were due and owing and an additional $156,250 continued to accrue each month.  (Doc. 1, Compl. at ¶ 82).

RED brought this action for breach of contract and declaratory judgment to enforce its right to recover the amounts allegedly due to it under the Commitment Letter.  Shores and Epstein moved to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, to transfer the action to the U.S. District Court for the Central District of California. These motions are ripe for resolution.

## II.    DISCUSSION

### A.    Motion to Dismiss for Lack of Personal Jurisdiction

In the present action, there are two possible grounds for this Court to exercise jurisdiction over Shores and Epstein: (1) a forum selection clause allegedly signed by Levine on behalf of Shores, and (2) the traditional analysis under Ohio's long-arm statute and the Due Process Clause.  While the Court appreciates the parties' detailed recitation of the facts surrounding Shores' contacts with Ohio, the Court need not undergo the due process analysis because it finds sufficient grounds to exercise jurisdiction over Shores and Epstein based on the forum selection clause as discussed below.

### 1.    Standard of Review

Defendants bring their first motion pursuant to Federal Rule of Civil Procedure 12(b)(2). When confronted with a Rule 12(b)(2) motion, "[t]he plaintiff bears the burden of establishing

the existence of jurisdiction." *Estate of Thompson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (citing *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006)). When the Court resolves a Rule 12(b)(2) motion based on "written submission and affidavits . . . rather than resolving the motion after an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight,' . . . and 'the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988); *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)).[1] Under such circumstances "the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh 'the controverting assertions of the party seeking dismissal.'" *Id.* (quoting *Theunissen*, 935 F.2d at 1459). If "the plaintiff's allegations of fact establish a *prima facie* case of personal jurisdiction, the inquiry ends; a court does not weigh controverting factual allegations of the defendant." *Highway Com. Servs., Inc. v. Zitis*, No. 07-cv-1252, 2008 WL 1809117, at *2 (S.D. Ohio Apr. 21, 2008) (Holschuh, J.) (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996); *Serras v. First Tenn. Bank Nat'l Assoc.*, 875 F.2d 1212, 1214 (6th Cir. 1989)). However, factual allegations of the defendant which are consistent with the plaintiff's allegations may be considered. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir. 1997).

Although Plaintiff's *prima facie* burden is relatively slight, the Court must still find that "'[p]laintiff has set forth **specific facts** that support a finding of jurisdiction in order to deny the

---

[1] This Court has three options when considering a 12(b)(2) motion, it can "decide the motion upon the affidavits alone, it may allow discovery in aid of deciding the motion, or it may conduct an evidentiary hearing to resolve the factual questions." *Perkins v. Liberty Mut. Ins. Co.*, No. 06-cv-00030, 2006 WL 1697630, at *1 (S.D. Ohio June 20, 2006) (Abel, M.J.) (internal citations omitted). Here, the parties never requested an evidentiary hearing on Barrett and Rutland's Motions to Dismiss; therefore, the *prima facie* standard generally governs. *See Morrison v. Taurus Int'l Co.*, No. 11-cv-322, 2012 WL 5493962, at *2, n.1 (S.D. Ohio Nov. 13, 2012) (Black, J.).

motion to dismiss.'"  *Palnik v. Westlake Entm't, Inc.*, 344 F. App'x 249, 251 (6th Cir. 2009) (quoting *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006)) (emphasis added).  Thus, "it remains the plaintiff's burden and the complaint must have 'established with reasonable particularity' those specific facts that support jurisdiction."  *Id.*  (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002)).  Consequently, the rules are designed in part to protect potential defendants from a "plaintiff's bald allegation of jurisdictional facts."  *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989).

Where a court finds a forum selection clause to be dispositive of the question of personal jurisdiction, the court need not consider petitioner's constitutional argument as to personal jurisdiction."  *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589 (1991) (citing *Ashwander v. TVA,* 297 U.S. 288, 347 (1936)).  The requirement that a court have personal jurisdiction "is a waivable right" and "[t]he use of a forum selection clause is one way in which contracting parties may agree in advance to submit to the jurisdiction of a particular court."  *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006) (citing generally *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972)).  Finally, when a forum selection clause serves as the basis for jurisdiction and that clause is subject to the statute of frauds, state law must be applied to determine the enforceability of the agreement.  *Manwaring v. Martinez*, 527 F. App'x. 390, 395 (6th Cir. 2013).

### 2. Analysis

Here, RED's claims for payment of the Extension Fees are based on the terms of the Commitment Letter.  Those terms also dictate that the rights and obligations of the parties under the Commitment Letter cannot be performed within one year.  This, of course, implicates Ohio's

statute of frauds.  As mentioned above, the parties dispute whether the Commitment Letter was signed by Epstein, Levine, or any other Shores representative.  Defendants contend neither Levine nor Shores signed the Commitment Letter based upon the recollections of Shores and a good faith review of the Project files.  (Doc. 16, Memo in Supp. at 6).  RED argues the statute of frauds has been satisfied because Shores and/or its representatives acknowledged the existence of—and accepted the terms of—the Commitment Letter by signing documents which referenced and/or incorporated the Commitment Letter.

The Ohio statute of frauds deems certain types of agreements to be unenforceable "unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."  O.R.C. 1335.05.  In Ohio, it is well-settled that "[t]he memorandum in writing satisfying the requirement of the Statute of Frauds may consist of several related writings, even though only one such writing is signed, if the signed writing refers to the unsigned writing or if it appears by inspection and comparison of the writings that they logically relate to or form part of the same transaction."  *LHPT Columbus, L.L.C. v. Capitol City Cardiology, Inc.*, 2014-Ohio-5247, 24 N.E.3d 712, ¶ 31 (citing *Soteriades v. Wendy's of Ft. Wayne, Inc.*, 34 Ohio App. 3d 222, 225, 517 N.E.2d 1011 (10th Dist. 1986), *Thayer v. Luce*, 22 Ohio St. 62 (1871), *McGilvery v. Shadel,* 87 Ohio App. 345, 95 N.E.2d 1 (6th Dist. 1949), and Restatement of the Law 2d, Contracts, Section 208, at 543 (1979)).  Further, "a court may construe multiple documents together if they concern the same transaction."  *Salvagne v. Fairfield Ford, Inc.*, 794 F. Supp. 2d 826, 833 (S.D. Ohio 2010) (quoting *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St. 3d 310, 314, 511 N.E.2d 106 (1987)).

Both RED and Defendants spent considerable time addressing whether the Opinion Letter authored by Levy is sufficient to satisfy the statute of frauds.  At the most basic level, these arguments focused on whether the Commitment Letter qualifies as a "memorandum or note" demonstrating the existence of the Commitment Letter with sufficient certainty.  Because the Court finds the Commitment Letter satisfies the statute of frauds by virtue of Epstein signing the Guaranty, it is not necessary for the Court to delve into the semantic arguments regarding Levy's scope of knowledge or the intended definition of the term "Loan Documents" as used in the Opinion Letter and whether that term intended to include the Commitment Letter.

In the Court's view, the most important takeaway from Defendants' argument regarding the Opinion Letter is that Defendants have seemingly taken the position that the Commitment Letter cannot satisfy the statute of frauds because it has not been signed, regardless of whether other, related documents acknowledge the existence of the Commitment Letter.  (*See* Doc. 28, Reply at 3–4 ("The Opinion Letter, therefore, cannot serve as an alternative memorandum or note, in the absence of an executed Commitment Letter, to satisfy the Statute of Frauds."); *see also*, *id.* at 5 ("The issue is whether the Commitment Letter was executed, as required by the Statute of Frauds.  It was not.")).  Defendants further argue that permitting RED "to rely on the Opinion Letter to circumvent the Statut[e] of Frauds . . . would defeat its purpose and the strong public policies supporting [it]."  (*Id.* at 5).  The Court is unpersuaded by this argument for two reasons.  First, as noted above, there is longstanding Ohio case law holding that not all written instruments falling under the purview of the statute of frauds need to be signed in order to satisfy the statute.  Rather, unsigned documents may satisfy the statute by virtue of other documents, which are part of the same transaction, sufficiently acknowledging the unsigned document's existence and essential terms.  Second, Defendants' position would render a portion of the

statute's language meaningless.  If the legislature intended that only a signed document could satisfy the statute of frauds, it would not have included the phrase "or some memorandum or note thereof."  The statute would simply read that the instrument would be unenforceable "unless the agreement upon which such action is brought is in writing and signed . . . ."

The Court need not look any further than the Guaranty signed by Epstein to find a related document, part of the same transaction, to serve as a signed memorandum or note.[2]  As noted above, the Commitment Letter is the document that gives rise to RED's right to collect extension fees in the event Shores was unable to obtain Final Endorsement of the Loan by November 1, 2013.  By signing the Guaranty, Epstein acknowledged the existence of the Commitment Letter and the rights and obligations of the parties set forth therein.  There can be no doubt that the two documents are part of the same transaction—*i.e.*, the Commitment Letter required Epstein to execute the Guaranty.  The Guaranty states in pertinent part:

> (1) All defined terms used in this Guaranty Agreement shall have the same meaning as set forth in the Commitment between [RED] and Shores . . . . [RED], pursuant to the terms and conditions of the Commitment and the FHA Commitment, has agreed to make to the Borrower a real estate mortgage loan insured by FHA.
>
> . . .
>
> (2) Pursuant to the terms of the Commitment, [Shores] may be obligated to pay [RED] or its assigns certain extension fees, costs, damages, interest costs, discounts, expenses and other charges.  The obligation of [RED] to fund the Insured Loan is subject to the condition precedent (among others) that [Epstein] execute and deliver this Guaranty Agreement to [RED].
>
> . . .
>
> (3) NOW, THEREFORE, in consideration of the premises and for the purposes of inducing [RED] to make the Insured Loan to [Shores] and intending to be legally bound hereby, [Epstein] unconditionally and absolutely guarantees the

---

[2] The Court notes that Defendants did not address the Guaranty with respect to it serving as the memorandum or note satisfying the statute of frauds in their Reply.

> full, due and punctual payment (and not merely the collectability) of the
> following: (a) All costs, expenses, losses and damages incurred by [RED] due
> to any breach by [Shores] of the Commitment or failure by [Shores] to
> perform any of its obligations thereunder[.]

(Doc. 1-10, Guaranty). As evidenced by these excerpts, the Guaranty contains many references to the Commitment Letter. When considered together, the Commitment Letter and the Guaranty "leave no room for doubt that the named parties had reached a definite agreement." *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 16 Ohio App. 3d 342, 349, 476 N.E.2d 388 (8th Dist. 1984). Epstein did not personally guarantee the $125 million Loan as a kindness. As the Guaranty clearly states, he did so pursuant to the terms of the Commitment Letter with the purpose of inducing RED to make the Loan to Shores. Accordingly, the Commitment Letter and Guaranty together satisfy the statute of frauds. It is further noted that Epstein cannot escape the effects of the forum selection clause by virtue of the fact that he was not a signatory to the Commitment Letter. *See Highway Commercial Servs., Inc. v. Zitis*, No. 07-cv-1252, 2008 WL 1809117, at *4 (S.D. Ohio Apr. 21, 2008) (Holschuh, J.) ("A non-party to a contract may be bound by a forum selection clause if the party is so closely related to the dispute that it is foreseeable that the party will be bound. For example, shareholders, officers, and directors of a corporation may be bound by a forum selection clause in a corporate contract.") (citing authorities). Epstein, who is a 50% owner of Shores, owner of Shores' Managing Member, and Guarantor of the Loan, is intimately associated with Shores, the Project, and the Loan. He easily satisfies this foreseeability test.

Having found the forum selection clause in the Commitment Letter to be valid, the Court will now address Defendants' argument that enforcing the clause would nevertheless be unfair and unreasonable. An otherwise valid forum selection clause is "unreasonable or unjust" and

cannot be upheld where "the chosen forum is so inconvenient as to, in effect, afford no remedy at all, thus 'depriving litigants of their day in court.'" *Preferred Capital*, 453 F.3d at 722 (quoting *Info. Leasing Corp. v. Jaskot*, 151 Ohio App. 3d 546, 552, 2003-Ohio-566, 784 N.E.2d 1192, ¶ 18 (8th Dist). "A finding of unreasonableness or injustice must be based on more than mere inconvenience to the party seeking to avoid the requirements of the forum selection clause." *Id.* "In determining whether the selected forum is sufficiently unreasonable, Ohio courts consider the following factors: (1) which law controls the contractual dispute; (2) the residency of the parties; (3) where the contract was executed; (4) where the witnesses and parties to the litigation are located; and (5) whether the forum clause's designated location is inconvenient to the parties." *Buckeye Check Cashing of Arizona, Inc. v. Lang*, No. 06-cv-792, 2007 WL 641824, at *7 (S.D. Ohio Feb. 23, 2007) (Graham, J.).

In applying the five factors identified in *Lang*, the Court concludes that it is not unreasonable or unjust to enforce the forum selection clause. The first factor does not weigh heavily in favor of maintaining this action in California or Ohio because the Commitment Letter contains a valid choice of law provision. As such, RED "would receive the benefit of its choice of law even if the case is tried in [California], since the courts in [California] would be capable of applying Ohio law." *Id.* at *8. As for the second factor, RED, being headquartered and having its principle place of business in Ohio, is a citizen of Delaware and Texas for the purposes of diversity jurisdiction, but is a resident of Ohio for the purposes of venue pursuant to 28 U.S.C. § 1391(c). Epstein and Shores are residents of California. Accordingly, the Court again gives little weight in favor of one jurisdiction over the other. As for the third factor, the contract was executed in Los Angeles by representatives of RED and Shores and Epstein. Fourth, there are multiple witnesses for each party in their respective states. RED has identified

at least six witnesses who live and work in Ohio.  Defendants, on the other hand, argue that witnesses from HUD, the architecture firm hired by Shores, and Shores representatives are all located in California.  Defendants also rely heavily on the fact that the property is located in California, but this is not a relevant factor in this analysis.  Finally, this Court must consider whether the forum clause's designated location is inconvenient to the parties.  Other than the traded hardships associated with having Ohio resident witnesses travel to California and vice versa, there is nothing in the evidentiary record to suggest that proceeding in California would be more convenient than proceeding in Ohio. [3]  Defendants argue in conclusory fashion that Epstein is 93 years old and would have "significant difficulty traveling to and from Columbus, Ohio to participate in Court proceedings, discovery, and trial."  (Doc. 16, Memo in Support at 30).  However, there is nothing in the evidentiary record to support this assertion.  On balance, the Court does not find it to be unreasonable or unjust to proceed in Ohio.  The Court recognizes that there are pros and cons to each jurisdiction, but there is not enough evidence to suggest that Ohio is so inconvenient as to deprive Shores and Epstein of their day in court.

In sum, the Court finds that the Commitment Letter satisfies the statute of frauds by virtue of the fact that Epstein, the President of Shores' Managing Member and 50% owner of Shores itself, executed a Guaranty which acknowledged the existence of the Commitment Letter and the rights and obligations arising thereunder.  This includes the forum selection clause naming the federal and local courts of Ohio as the exclusive forum to litigate any disputes arising thereunder.  Accordingly, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED.**

---

[3] The Court is not persuaded by Defendants' inference that it is somehow less burdensome for RED's witnesses to travel to California based on the simple fact that they have done so in the past.

**B.     Motion to Dismiss for Improper Venue**

Defendants also moved to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), or, in the alternative, to transfer the action to the U.S. District Court for the Central District of California pursuant to 28 U.S.C. § 1406(a).

Under Section 1391(b), venue is proper in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)–(3).  If venue is not proper under one of these three categories, the case must be dismissed or transferred under Section 1406(a).  *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tx.,* –––– U.S. ––––, 134 S. Ct. 568, 577 (2013).  Further, the determination of whether venue is improper depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws irrespective of any forum selection clause that may apply in the case.  *Id.* at 578.

Here, Plaintiffs claim venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Columbus, Ohio.  Under this provision, venue may be proper in multiple districts.  *First Michigan Corp. v. Bramlet,* 141 F.3d 260, 263 (6th Cir.1998).  "In the context of an action for breach of contract, courts making venue determinations have looked to such factors as where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.  *Parenteau v. Century Bank*, No. 07-cv-851, 2008 WL 281626, at *3 (S.D. Ohio Jan. 31, 2008) (Graham, J.).  "Courts

may also consider where the effects of a defendant's alleged breach are experienced." *Reilly v. Meffe*, 6 F. Supp. 3d 760, 766 (S.D. Ohio 2014) (Marbley, J.) (citing *Sygnetics, Inc. v. Hops Int'l, Inc.,* No. 12–cv–14328, 2013 WL 1395806, at *3 (E.D. Mich. Apr. 5, 2013)). The Sixth Circuit has held that courts may consider the actions of both plaintiffs and defendants to determine where a substantial part of the events underlying the plaintiff's claims arose. *See First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 264 (6th Cir. 1998).

Applying these cases, there is sufficient evidence for this Court to find that venue is proper in this district. The Loan's underwriting process took approximately ten months to complete. The vast majority of this process took place at RED's principle office in Ohio. Further, negotiations for the Loan were primarily made through telephonic or electronic communication between California and Ohio. Finally, it was foreseeable to Defendants that any effects of the breach would be felt by RED in Ohio.

For the foregoing reasons, Defendants' Motion to Dismiss for Improper Venue is **DENIED**. Because venue is proper in this case under Section 1391(b)(2) and Section 1406(a) is only applicable in situations where the case was filed "in the wrong division or district," the Court declines to transfer pursuant to 28 U.S.C. § 1406(a).

## C. Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)

Finally, Defendants argue that 28 U.S.C.§ 1404(a) necessitates that this action be transferred to the U.S. District Court for the Central District of California for the convenience of the parties and in the interest of justice.

### 1. Standard of Review

Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The threshold issue under § 1404(a) is whether the action

could be brought in the transferee court. *Kay v. Nat'l City Mortg. Co.*, 494 F. Supp. 2d 845, 849 (S.D. Ohio 2007). If a case could be brought in the court "the issue becomes whether transfer is justified under the balance of the language of § 1404(a)." *Id.* at 849. In balancing convenience, the Court must consider a number of factors such as "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir. 2006) (quoting *Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)).

The moving party bears the burden to establish a need for transfer. *Kay*, 494 F. Supp. 2d at 849-50 (citing *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 945 (S.D. Ohio 2002) (Sargus, C.J.)). Transfer pursuant to § 1404 must be "to a **more** convenient forum, not to a forum likely to prove equally convenient or inconvenient." *Van Dusen v. Barrack*, 376 U.S. 612, 645-46 (1964) (emphasis added); *see also Shanehchian v. Macy's Inc.*, 251 F.R.D. 287, 292 (S.D. Ohio 2008) ("[Section] 1404 does not allow . . . for transfer if that transfer would only shift the inconvenience from one party to another."). Furthermore, when balancing the 1404(a) factors, "the Court does not start with the assumption that the case should proceed in whichever forum is slightly more advantageous to the parties or the witnesses." *Levy v. Cain, Watters & Assocs.*, No. 09-cv-723, 2010 WL 271300, at *9 (S.D. Ohio Jan. 15, 2010) (Frost, J.) (citation omitted).

"Ultimately . . . the decision whether to transfer venue under § 1404(a) is committed to the sound discretion of the trial court." *Levy*, 2010 WL 271300, at *9; *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009) ("As the permissive language of the transfer statute suggests, district courts have 'broad discretion' to determine when party 'convenience' or 'the interest of

justice' makes a transfer appropriate.").  Section 1404(a) promotes "an individualized case by case consideration of convenience and fairness."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (internal quotation marks omitted).

### 2.    Analysis

Defendants ask this Court to exercise its discretion to transfer this case under the permissive language of Section 1404(a).  In so doing, Defendants discussed the nine factors identified by the Sixth Circuit to guide courts in determining whether discretionary transfer may be appropriate.  The following nine factors are based on private and public interest concerns:  (1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.  *Inter-Nat'l Found. Corp. v. Disney 1999 Ltd. P'ship*, No. 09-cv-983, 2010 WL 1438759, at *2 (S.D. Ohio Apr. 9, 2010) (Graham, J.) (citing *Perceptron, Inc. v. Silicon Video, Inc.,* 423 F. Supp. 2d 722, 729 (E.D. Mich. 2006)).  However, RED correctly points out that "[t]he calculus changes [] when the parties' contract contains a valid forum selection clause, which 'represents the parties' agreement as to the most proper forum.'"  *Atl. Marine Constr.*, 134 S. Ct. at 579.  (quoting *Stewart*, 487 U.S. at 31 (1988)).  When the parties have agreed to a valid forum selection clause, courts "should not consider arguments about the parties' private interests," because "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."  *Id.* at 582.  As such, courts may only

consider public-interest factors which "will rarely defeat a transfer motion." *Id.*  This leads to the conclusion "that forum-selection clauses should control except in unusual cases" and "a valid forum-selection clause is given controlling weight in all but the most exceptional cases." *Stewart*, 487 U.S. at 33.

The Court has found a valid forum selection agreement between the parties.  As such, the Court need not consider Defendants' private-interest factors.  However, it is appropriate for the Court to consider the following public-interest factors raised by Defendants: (1) the forum's familiarity with governing law; (2) the Plaintiff's choice of forum; and (3) the public policy behind protecting the integrity of the statute of frauds.  Each of these factors will be discussed in turn.

As for the forum's familiarity with governing law, Defendants acknowledge that both this Court and the Central District of California are capable of applying the laws of Ohio or California and "this factor does not weigh heavily in favor of one jurisdiction over the other." (Doc. 16, Memo in Support at 33 (citing *Lang*, 2007 WL 641824, at *8)).  Defendants then continue that the Central District of California is better suited to hear this case because California law should apply to issues relating to real property situated in California.  The Court agrees with Defendants' position that this Court is as equally capable of applying governing law.  Defendants have not identified any other overriding public policy concerns that would make California a more suitable venue than Ohio.

As to the second factor, Defendants argue that this court should defer jurisdiction to the Central District of California because Defendants filed a similar action there shortly after this case was filed.  This issue has become moot since the time the parties briefed this issue.  On November 9, 2016, the Central District of California dismissed Defendants suit without prejudice

pursuant to the "first-to-file" rule. Defendant's remaining argument—that Ohio has no interest in the underlying dispute—is unavailing. RED is headquartered in Columbus and the effects of the alleged breach would be felt in Ohio if Shores and Epstein have indeed breached their contract with RED.

Finally, Defendants argue that this Court should "reject Plaintiff's attempt to hail Defendants into Court in Ohio based upon a Commitment Letter that is subject to the Statute of Frauds, but, as Plaintiffs acknowledge, is not signed by the Defendants." This Court fully appreciates the significance of the statute of frauds and is of the opinion that maintaining this suit in Ohio does not offend the importance of the statute.

Based on these factors, this Court declines to exercise its discretionary right to transfer this case to the Central District of California and Defendants' request is **DENIED**.

### III.    CONCLUSION

Based on the foregoing, Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or in the Alternative to Transfer Action Pursuant to 28 U.S.C. §§ 1406 and 1404(a) (Doc. 16) are **DENIED**. The Clerk shall **REMOVE** Document 16 from the Court's pending motions list.

**IT IS SO ORDERED.**

_/s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**